UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES, | ) |
| | ) |
| v. | ) Misc. No. 1:07-mc-00386-RCL |
| | ) |
| FARZAD DARUI, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT FARZAD DARUI'S BRIEF IN OPPOSITION
TO MOTION TO QUASH SUBPOENA TO THE ISLAMIC CENTER**

PRELIMINARY STATEMENT

As the Supreme Court has recognized, "[t]he ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." *United States v. Nixon*, 418 U.S. 683, 709 (1974). Thus the Constitution affords criminal defendants the right to obtain evidence and, where necessary, to compel its production. *Id.* at 711. To protect and enforce that right, Rule 17(c) authorizes defendants to subpoena documents from third parties and, where appropriate, to obtain those documents in advance of trial. *See Bowman Dairy Co. v. United States*, 341 U.S. 214, 219-20 (1951). A trial court's power to enforce such subpoenas is a "fundamental instrument of justice" in a criminal case. *United States v. Liddy*, 354 F. Supp. 208, 211 (D.D.C. 1972).

Farzad Darui seeks the production by subpoena of evidence that will demonstrate that his accuser, Abdullah Khouj, has lied under oath regarding their relationship and the true reasons for the payments at issue, central to defending the allegations of the supposed scheme to defraud. The subpoena to the Islamic Center thus seeks documents essential to Darui's defense. With due respect for the necessity of this evidence, this Court should quash or modify the subpoena only "if compliance would be unreasonable

or oppressive." *See* Fed. R. Crim. P. 17(c)(2). The Islamic Center offers little or no basis to support such a finding and ignores Darui's version of events, choosing instead to focus myopically on selected allegations of the indictment.

Further, the Islamic Center's counsel, Williams & Connolly, previously agreed to produce a number of the documents requested pursuant to the very subpoena they now seek to quash, presumably because those requests were neither unreasonable nor oppressive. And the firm should not be heard to complain now about the burden imposed by the subpoena because it has put these very documents at issue by proffering to the United States District Court for the Eastern District of Virginia an affidavit from Khouj in a civil action, which was based on the same allegations here.[1] That affidavit is indisputably false, as demonstrated by the *Brady* material provided by the government. The documents sought by the subpoena will further support the falsity of the affidavit and, therefore, undermine the government's alleged scheme to defraud. Under these circumstances, the motion should be denied.

## THE LAW

"A subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise." *Nixon*, 418 U.S. at 698. In *Nixon*, the Supreme Court held that if a subpoena meets three criteria—relevance, admissibility, and specificity—that subpoena should be enforced. *See id.* at 700. While paying lip service to that standard, the Center attempts to quash Darui's subpoena based on an incorrect interpretation of the law. In its view, to obtain enforcement of a subpoena, a party must

---

[1] As evidenced by meetings with counsel for the government and the case agent and the provision of documents, the Center and its counsel have cooperated with the government in this prosecution. Presumably, such cooperation was no more burdensome than Darui's requests aimed at defending himself.

2

identify with particularity the exact document he seeks, describe the precise content it contains, and establish with certainty that it will be admissible at trial. If the standard were such, a party would rarely (if ever) be entitled to third-party documentary evidence in advance of trial, and the constitutional purposes underlying Rule 17(c) would be eviscerated.

*Nixon* makes clear the law imposes no such burden. In that case, the government subpoenaed for use at trial tape recordings and documents relating to conversations between the President and certain aides and advisors. The Court upheld the subpoena, notwithstanding the government's inability to "describe fully" the contents of the materials, or to say with certainty they contained admissible evidence. Rather, the Court held that it is adequate to show "a sufficient likelihood" that the documents contain material "relevant to the offenses charged in the indictment," and to make a "sufficient preliminary showing" that the material sought "contains evidence admissible" at trial. 418 U.S. at 700. The Court acknowledged it would be impossible for a party—in advance of actually receiving the documents—to say precisely what evidentiary value they might have. *See id*. It also recognized that a party cannot necessarily pinpoint, before a trial begins, the exact basis on which a document may be admitted. *See id*. at 702 (enforcing the subpoena because there were "valid potential evidentiary uses" for the material sought). Therefore, the Court held that a subpoena can be enforced based on "rational inference[s]"—drawn from the information available at the time—that the evidence sought would "relate to the offenses charged in the indictment" and could likely be admitted at trial. *Id*. at 700.

3

*Nixon* also made clear that it is perfectly permissible for a court to grant access to potential witness impeachment evidence before a trial begins.  The Court recognized that, although "the need for evidence to impeach witnesses" might not "generally" be sufficient to require pre-trial production, this rule is not absolute and must yield where circumstances require it.  In *Nixon*, the Court concluded that "the analysis and possible transcription of the tapes [at issue] may take a significant period of time."  Therefore, it was well within the district court's discretion to order pre-trial return.  Doing so would ensure that the government could "properly prepare" its case and prevent unreasonable delay at trial.  *See id.* at 699, 701-02.  As shown below, the same circumstances are present here.

Lower courts have remained faithful to the Supreme Court's teachings when considering pre-trial subpoenas issued by criminal defendants.  They have applied Nixon's "sufficient likelihood" standard in considering a document's potential relevance. *See, e.g., United States v. LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988) (circumstantial evidence "supports the district court's finding of [a] likelihood that the outtakes would reveal inconsistent statements and bias"); *United States v. Poindexter*, 725 F. Supp. 13, 30 (D.D.C. 1989).  And they have rejected a benchmark of "exquisite specificity" that would require a defendant to identify with particularity each of the documents sought and what specific evidence those documents contain.  *See United States v. Poindexter*, 727 F. Supp. 1501, 1510 (D.D.C. 1989); *United States v. Haldeman*, 559 F.2d 31, 76 n.92 (D.C. Cir. 1976) ("Now, if a paper be in possession of the opposite party, what statement of its contents or applicability can be expected from the person who claims its production, he not precisely knowing its contents?") (citation and internal

quotation marks omitted). Rather, it is sufficient for a defendant to explain what he "reasonably . . . believe[s] to be contained in the documents sought," and why that material may be relevant to his defense. *See United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991).

Courts also do not require defendants to establish with certainty that a document will be admissible before trial begins—recognizing it would be almost impossible to do so. *See United States v. Orena*, 883 F. Supp. 849, 868 (S.D.N.Y. 1995). It is sufficient that the documents are "at least potentially admissible" or might "form the basis for eliciting certain testimony at trial." *Id.* (enforcing subpoena because documents might be used as, e.g., recorded recollections). What is more, consistent with *Nixon*, courts often enforce subpoenas seeking documents with potential witness impeachment value—particularly where, as here, the evidence relates to individuals who are virtually certain to testify and there is a clear indication of what they will say. *See, e.g., LaRouche Campaign*, 841 F.2d at 1180; *United States v. King*, 194 F.R.D. 569, 574 (E.D. Va. 2000); *Liddy*, 354 F. Supp. at 215 (granting pre-trial "access to materials which contain prior statements of the witness, statements that possibly might be admissible into evidence to discredit or impeach that witness") (emphasis added). Indeed, "[i]f impeachment evidence is available, it is critical that the defendants have access to it," *id.* at 215, and well within a trial court's discretion to order such access in advance of trial, *see Nixon*, 418 U.S. at 702; *LaRouche*, 841 F.2d at 1180.

1. ***There is a "sufficient likelihood" that the documents sought are relevant to the charges and Darui's defense.***

The Center and Khouj have a vested interest in denying Darui the means of demonstrating that their allegations are false. They have set in motion a criminal prosecution based on false statements and perjury. And, as noted above, the government has already provided certain evidence conclusively demonstrating the falsity of various claims in an affidavit filed by Khouj in the civil action.

As an example, Khouj stated under oath in his affidavit in the civil case that:

> 6.   Mr. Darui told me that the Center could not commission an audit, as I repeatedly requested, until it obtained its cancelled checks. He told me that the cancelled checks were sent to the Center's accountants. After Mr. Darui's repeated delays in commissioning an audit of the Center's finances, I requested the cancelled checks from the Center's accountants myself. However, the accountants told me that they did not have, and never had, the cancelled checks.
>
> 7.   I then contacted the Center's bank, Bank of America, and learned that, without my knowledge or authorization, Mr. Darui had directed Bank of America to mail the cancelled checks to a Post Office box that he opened. In this way, Mr. Darui was able to hide from me and others at the Center his fraud, because the cancelled checks showing the altered payee names were mailed directly to him at a place to which no one at the Center knew about or had access.
>
> 8.   After I learned this, I requested a copy of the cancelled checks, directly from Bank of America. When I reviewed them, I immediately saw that the copies of the cancelled checks showed *that they were cashed by numerous companies that I had never seen, and to which I had never authorized the payment of any of the Center's funds. I have subsequently learned that the payees on these altered checks were companies owned and/or controlled by Mr. Darui*.

Declaration of Dr. Abdullah M. Khouj in Opposition to Defendant's Motion to Dismiss Or, In the Alternative, Motion to Stay Proceedings (attached as Exhibit 1), *The Islamic Center of Washington, D.C. v. Farzad Darui*, In the United States District Court for the Eastern District of Virginia, Civil Action No. 1:06-cv-1056 (emphasis added).

6

Despite these statements under oath and subject to the penalty for perjury, the government has provided checks *signed by Khouj* payable to some of the "numerous companies that [he] had never seen, and to which [he] had never authorized the payment of any of the Center's funds."

Additionally, the government provided Darui's counsel a list of the checks at issue. On that list was check # 7866, an Administrative account check made out to Blue Line Travel, Inc. signed by Khouj. During a thorough review of the documents seized during the government's searches, Darui's counsel (and subsequently the government) found the original cancelled check # 7866. It appears to be the only extant original cancelled check of all the checks at issue.[2] The government has since removed check # 7866 from its list, now admitting it was genuine. The Center's true problem is not the scope or number of the documents sought but that those documents will demonstrate that Khouj has perjured himself.

2.  ***The temporal scope of various requests is a direct result of Darui's length of employment with the Islamic Center.***

The Islamic Center complains of the temporal scope of many of the requests. At first glance that scope appears facially broad enough to raise a judicial eyebrow. But the scope is a direct by-product of the length of Darui's association with Khouj and the Islamic Center—a period of over twenty years. The long term debt incurred by Khouj for the housing and feeding of his "wives" spanned that time period. And the treatment by the Center of certain expenses during that time period—for example, payments to certain informers regarding radical Islamist activity and how those were concealed by Khouj

---

[2] Only Khouj and Darui had the key to the storage room where all the original cancelled checks were kept. When Darui left for vacation in August 2006, original cancelled checks for over a decade were there. Darui was never allowed to return to the Center. The government states it found no such original cancelled checks at the storage site.

from the Saudis—is also central to Darui's defense.  In that respect alone, this case is unlike almost any other with respect to "third party" subpoenas.  In this case, the Center and Khouj are practically parties (and, indeed, are direct sources, along with their counsel, of the government's mistaken allegations).

3.  ***The individual requests will directly support Darui's claims and are sufficiently specific.***

Invoking the hackneyed "fishing expedition," the Center identifies particular requests as violating the specificity requirement of Rule 17(c), focusing on requests 14 through 19.  "Of course one person's fishing expedition is another's exhaustive investigation."  *United States v. Tomison*, 969 F. Supp. 587, 594 (D. Cal. 1997) (describing as "brass" the government's objection to fishing expeditions, given its routine behavior relative to subpoenas duces tecum issued in connection with grand jury investigations, and holding that government lacks standing to move to quash a defendant's subpoena *duces tecum*).

Each category of documents sought will demonstrate that:

1)  Khouj had actual knowledge of and, on behalf of the Islamic Center, approved of Darui's actions;

2)  beyond the time frame of the indictment, these same activities had occurred with Khouj's full knowledge and approval;

3)  Khouj's statements in his affidavit (regarding the same matters at issue in this case) were perjurious and knowingly untruthful;

4)  cash was paid to Khouj's "wives" consistent with Darui's assertions; and,

5)  the so-called "Special Account," held in Khouj's taxpayer identification number was his own personal account.

Finally, as to paragraph 19, which seeks "documents reflecting payment of Washington, D.C. sales tax from The Islamic Center's Bookstore from January 1, 2000 to

8

present," the Islamic Center's counsel previously agreed to produce them, a response that would indicate the request was specific enough to understand what was being sought.

4. ***Darui has demonstrated a "sufficient likelihood" the documents sought are relevant and admissible.***

The Center asks the Court to "evaluate Defendant's attempts at discovery against the background of the charges in this indictment." Of course, such a narrow focus ignores one entire side of this adversary proceeding—namely, the defense. Even were this not so, it mischaracterizes the express allegations of the indictment.

For example, the Center claims that "[n]othing in the indictment charges that other persons employed by the Center were part of Defendant's scheme to defraud the Center, nor does it charge that Defendant mishandled employees' pay stubs, time cards, W-4 forms or records of employees' tax withholdings." Memorandum in Support of Motion to Quash at p. 6. Yet the indictment specifically alleges:

> [it] was further a part of the scheme and artifice that defendant FARZAD DARUI obtained checks payable to *employees* or contractors of the Center and, without authority from the named payee on the checks, negotiated and deposited the checks directly into either the Zaal checking account or into the Blue Line checking account.

Indictment, ¶ 17 (emphasis added).

In fact, with Khouj's approval, these checks were never intended for the Center's employees. Instead, they were used for payments to informants who assisted the Center by keeping tabs on radical Islamist groups who were a constant potential threat to the Center's operations. Accordingly, the documents sought will support this claim by demonstrating that the actual employees received all payments to which they were entitled and none was diverted by Darui.

9

The Center complains of requests 3 and 4, which seek copies of newsletters and bulletins and printing receipts, payment records, and typesetting receipts. Here, the Center fails to appreciate that payments were routinely made to Khouj's "wives" or their relatives. For example, Khouj told the government that regular payments to Debbi Estrada were for her work on the Center's newsletter, though, in truth, she never performed such work. Matching up the payments with the newsletters and other documents will demonstrate that fact. Instead, it was another ruse by Khouj to support his "wives," which is consistent with Darui's claim that the funds he is accused of embezzling were, instead, repayments for Darui's financial assistance in supporting Khouj's "wives."

With respect to requests 6 to 8, which seek documentation regarding the membership of the Islamic Center's Board, such information will directly demonstrate who was authorized at various times to approve disbursements for the Center. Such documents are therefore relevant and admissible. That is likely why, at least as to requests 6 and 7, counsel for the Center previously agreed to produce them.

With respect to requests 9 through 11, the Center's counsel had previously agreed to produce the meeting minutes requested, presumably recognizing their relevance to the case. And as to requests 12 and 13, counsel agreed to produce non-privileged documents.

Under the circumstances, Darui has shown a "sufficient likelihood" of relevance and admissibility of the documents sought.

5.   *The Clerk advised counsel that the subpoena should not be made returnable to the Court.*

The Center complains the subpoena has been made returnable to counsel's offices as opposed to the Clerk of this Court. Yet this was done at the direction of the Clerk (who presumably does not wish to maintain documents subpoenaed in every case in perpetuity). In the context of a fraud prosecution covering approximately six years and involving the production of well over 100,000 documents already, such a position seems eminently sensible. Should the Court decide that Rule 17(c) requires otherwise, counsel will, of course, abide by that ruling.

## CONCLUSION

Mr. Darui seeks specific, relevant, and admissible evidence to clear his name. Restricting his defense to only that which fits neatly within the government's theory of the case precludes his ability to challenge the false claims made by the Center and Khouj and denies his constitutional right to compulsory process. Accordingly, the motion to quash should be denied.

FARZAD DARUI<br>
By Counsel

_____/S/_____
Victoria Toensing (DC Bar #304980)
Joseph diGenova
Brady Toensing
diGENOVA & TOENSING, LLP
1776 K Street, N.W., Suite 737
Washington, D.C. 20006
(202) 289-7701
(202) 289-7706 (fax)
Counsel for Defendant


_____/S/_____
Aaron S. Book (DC Bar # 490815)
Steven T. Webster (admitted *pro hac vice*)
WEBSTER BOOK LLP
1 North King Street
Leesburg, Virginia 20176
703-779-8229
703-991-9178 (fax)
Counsel for Defendant

CERTIFICATE OF SERVICE

      I hereby certify that on October 15, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Richard M. Cooper, Esq.
Robert P. Watkins, Esq.
Ana C. Reyes, Esq.
Williams & Connolly
725 Twelfth Street N.W.
Washington, D.C. 20005-5901
202-434-5000
202-434-5029 (fax)
Counsel for Abdullah M. Khouj

Ronald Sharpe, Esq.
Assistant United States Attorney
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530


      /S/
Aaron S. Book